IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SUSQUEHANNA INTERNATIONAL GROUP, LLP<br>401 City Line Avenue<br>Bala Cynwyd, Pennsylvania 19004<br><br>               Plaintiff,<br><br>    v.<br><br>JILL CARNEVALE<br>c/o Deutsche Bank Securities, Inc.<br>60 Wall Street<br>New York, NY 10005<br><br>RICHARD MORIARTY<br>c/o Deutsche Bank Securities, Inc.<br>60 Wall Street<br>New York, NY 10005<br><br>DEUTSCHE BANK SECURITIES, INC.<br>60 Wall Street<br>New York, New York 10005<br><br>              Defendants. | Civil Action No.<br><br>06 -1908 |

## COMPLAINT

Plaintiff, Susquehanna International Group, LLP (collectively with its affiliated entities, "SIG") by its undersigned counsel, brings this Complaint for Injunctive Relief to enforce non-interference agreements and enjoin defendants, Jill Carnevale ("Carnevale") and Richard Moriarty ("Moriarty") (sometimes referred to herein as the "individual defendants") from violating their respective agreements, breaching their fiduciary duties owed to SIG and, in the case of Deutsche Bank Securities, Inc. ("Deutsche Bank"), as well as the individual defendants, from interfering with SIG's contractual rights.

In support hereof, SIG alleges as follows:

## THE PARTIES

1. Plaintiff, Susquehanna International Group, LLP ("SIG"), is a Delaware limited liability partnership with its principal place of business at 401 City Line Avenue, Bala Cynwyd, Pennsylvania. SIG's partners are all juridical entities whose citizenship is either Pennsylvania or Delaware.

2. Defendant, Jill Carnevale, upon information and belief, is a citizen of the State of New York.

3. Defendant, Richard Moriarty, upon information and belief, is a citizen of the State of New York.

4. Defendant, Deutsche Bank Securities, Inc., is a Delaware corporation with a principal place of business located at 60 Wall Street, New York, New York 10005.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) and (c) because this action involves a dispute between citizens of different states, and the amount in controversy is in excess of $75,000.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in this district. Further, defendants Carnevale and Moriarty both agreed to submit to the exclusive jurisdiction of this Court as to all actions and proceedings relating to their employment agreements.

## FACTS

7. SIG, either directly or though its subsidiaries and affiliates, is in the business of, among other things, providing institutional brokerage services, and providing industry and corporate research and analysis to its institutional brokerage customers.

8. SIG is headquartered in Bala Cynwyd, Pennsylvania, but it and its affiliates have offices nationally and internationally.

9. SIG competes with other large brokerage firms for institutional brokerage customers. SIG uses Research Sales employees, such as Defendants Carnevale and Moriarty, to develop and maintain customer relationships with institutional brokerage customers.

10. SIG invests time and money to provide its Research Sales employees with research, market information, and customer information to permit them to develop and maintain order flow from these customers.

11. Through the various contracts with each employee, SIG balances, on the one hand, the rights of its employees to seek future employment and, on the other, SIG's interests in protecting its goodwill, business relationships, and confidential business information.

12. Importantly, SIG will freely permit Carnevale and Moriarty to work in almost any capacity they choose, with any employer, anywhere. The only limitations placed on them is that for nine months they may not work with each other, or generally, with any current or recently employed SIG employee (i.e., an employee that has not been out of SIG's employ for at least nine months) and they may not use SIG's confidential business information.

13. SIG's employment contracts also prohibit the individual defendants from soliciting other SIG employees or inducing individuals to leave SIG's employ for a period of five years.

14. Both of the individual defendants have directly breached fiduciary and contractual duties owed to SIG, interfered with SIG's contracts with each of the other individual defendants, and interfered with SIG's existing customer relationships, and all of the defendants have worked in concert to deprive SIG of its contractual rights.

## Moriarty's Duties with SIG

15.     Moriarty was employed by SIG as a Research Sales Person from February 26, 2004 until March 17, 2006, when he resigned.

16.     During the time of his employment, Moriarty was paid a base salary rate of $150,000 per year and received bonuses for 2004 and 2005 with a combined total of over $900,000. Moriarty was also paid a signing bonus of $165,000 in 2004.

17.     At all times, Moriarty's employment with SIG was governed by one of two employment agreements.

18.     The first employment agreement ran from February 26, 2004 through December 31, 2005.

19.     The second employment agreement, which superseded the first employment agreement, was entered into on March 22, 2005 and was effective from January 1, 2005 through December 31, 2005.

20.     Moriarty also entered into a Non-Interference Agreement and a Confidential Information Agreement.

21.     Collectively, these agreements placed the following relevant restrictions upon Moriarty:

(a)     while employed by SIG, and for five years thereafter, he will not induce or solicit a SIG employee or consultant to leave SIG;

(b)     while employed by SIG, and for five years thereafter, he will not hire or solicit a "SIG Person" (defined in the non-interference agreement as someone who within the prior nine months was a SIG employee, consultant or a person seconded from SIG), directly or indirectly;

(c) for nine months following his employment, he will not be employed by or otherwise provide service to any unit of a SIG competitor which employs a SIG Person; and

(d) he will not use or disclose SIG's confidential information.

22. These restrictions are necessary to protect SIG's confidential information, goodwill, and customer relationships.

### Carnevale's Duties with SIG

23. Carnevale was employed by SIG as a Research Sales Person from March 1, 2004 until March 17, 2006, when she resigned.

24. During the time of her employment, Carnevale was paid a base salary rate of $125,000 for 2004, $125,000 for 2005 and $200,000 for 2006. She received bonuses in 2004 and 2005 with a combined total of over $125,000.

25. At all times, Carnevale's employment with SIG was governed by one of two employment agreements.

26. The first employment agreement ran from March 1, 2004 through December 31, 2005.

27. The second employment agreement, which superseded the first employment agreement, was entered into on March 22, 2005 and was effective from January 1, 2005 through December 31, 2005.

28. Carnevale also entered into a Non-Interference Agreement and a Confidential Information Agreement.

29. Collectively, these agreements placed the following relevant restrictions upon Carnevale:

(a) while employed by SIG, and for five years thereafter, she will not induce or solicit a SIG employee or consultant to leave SIG;

(b) while employed by SIG, and for five years thereafter, she will not hire or solicit a "SIG Person" directly or indirectly;

(c) for nine months following her employment, she will not be employed by or otherwise provide service to any unit of a SIG competitor which employs a SIG Person; and

(d) she will not use or disclose SIG's confidential information.

30. These restrictions are necessary to protect SIG's confidential information, goodwill, and customer relationships.

### Defendants' Misconduct

31. Upon information and belief, beginning at least as early as November 2005, defendant Moriarty, while employed by SIG, began negotiating with defendant Deutsche Bank to accept a job identical to his job at SIG.

32. Upon information and belief, in furtherance of this plan, Moriarty met with representatives of Deutsche Bank in its New York offices on December 12, 2005.

33. Thereafter, at some point Deutsche Bank and Moriarty reached an agreement that he would accept employment with Deutsche Bank. While or after reaching this agreement, Deutsche Bank and Moriarty developed a plan to raid from SIG other experienced SIG employees who, collectively, will combine their specific customer knowledge and research/marketing techniques, for purposes of competing with SIG and benefiting the defendants.

34. In furtherance of this plan, Moriarty, while employed by SIG, solicited defendant Carnevale and a SIG sales-trader, Stephen Pocina, to leave the employ of SIG.

35. Upon information and belief, Moriarty has begun employment with Deutsche Bank.

36. Upon information and belief, Carnevale has joined Moriarty at Deutsche Bank. Moriarty and Carnevale will now be able to combine the respective knowledge they garnered from servicing SIG's customers, and will be able to utilize SIG's financial investment in developing these customer relationships over the prior years, to SIG's detriment.

37. Upon information and belief, Stephen Pocina was scheduled to begin employment at Deutsche Bank. Mr. Pocina, however, was recently arrested in Chicago for vehicular homicide and will not be able to begin his employment at Deutsche Bank.

38. Upon information and belief, the individual defendants purposely refrained from resigning, despite the fact that they had agreed to join Deutsche Bank, for the sole purpose of receiving their respective bonuses for the year 2005.

39. Upon information and belief, Derek Capanna, Managing Director and Head of Americas Cash Equity Sales of Deutsche Bank, with full knowledge of SIG's agreements with Carnevale and Moriarty, encouraged them to disregard their contracts and join Deutsche Bank.

40. Upon information and belief, both individual defendants are working, or are planning to commence working, in the same capacity as they did while employed at SIG.

41. The individual defendants began their efforts to violate SIG's contractual rights on SIG's premises, using SIG's e-mail and instant messaging services, while being paid by SIG.

42. Defendants are fully aware of the individual defendants' contractual obligations to SIG, including their obligations under their respective employment and non-interference agreements.

43. SIG carefully contracts with each of its employees to prevent precisely what defendants are trying to do here: leaving SIG's employ and combining their efforts and

knowledge promoted and refined while employed by SIG, to steal SIG's business strategies, competitive advantages, and customers.

44. Defendants' actions are intentional, outrageous, and are maliciously designed to deprive SIG of its contractual rights and legal protections.

## COUNT I

### BREACH OF CONTRACT
(against defendants, Carnevale and Moriarty)

45. SIG incorporates by reference, as if fully set forth herein, the allegations in paragraphs 1 through 44.

46. By their conduct as set forth above, the individual defendants have each breached their respective agreements with SIG.

47. The conduct of defendants Carnevale and Moriarty constitutes a breach of their respective non-interference agreements.

48. The individual defendants' breaches of the terms of their respective agreements have caused and will continue to cause SIG irreparable harm, for which SIG has no adequate remedy at law. The irreparable harm includes, but is not limited to, the individual defendants' ability to re-create their research-sales team in order to benefit all defendants, including Deutsche Bank, who is a direct competitor of SIG's, in violation of their respective non-interference agreements.

49. SIG will continue to suffer irreparable harm unless injunctive relief is granted by the Court.

50. SIG is entitled to preliminary and permanent injunctive relief requiring all defendants to honor the contracts between SIG and the individual defendants because: (1) SIG has a clear right to relief; (2) SIG has and will continue to suffer irreparable injury if an

injunction is not granted; (3) granting of injunctive relief will not result in greater harm to defendants; and (4) granting the injunctive relief will benefit the public interest.

**WHEREFORE**, SIG respectfully requests that this Court enter judgment in its favor and against defendants for:

(a) injunctive relief to prevent the continued breach or future breaches of the agreements between SIG and the individual defendants; or, in the alternative

(b) an award of monetary damages against the individual defendants and in favor of SIG in an amount equal to the damages that the Court determines SIG has sustained as a direct and proximate result of defendant's actions, including, but not limited to, lost profits, lost opportunity, and the loss of the benefit of SIG's contractual rights; and

(c) any such other relief as the Court deems just and proper.

## COUNT II

### TORTIOUS INTERFERENCE WITH CONTRACT
**(against all defendants)**

51. SIG incorporates by reference, as if fully set forth herein, the allegations in paragraph 1 through 50.

52. Defendants Carnevale and Moriarty each have separate contractual duties owed to SIG, including non-interference duties.

53. By their joint efforts to become employed with the same employer, each defendant has directly induced the other individual defendants to breach their respective contracts with SIG.

54. Upon information and belief, defendant Deutsche Bank had full knowledge of the contracts and induced Carnevale and Moriarty to breach their respective contracts with SIG.

55. As a direct and proximate result of defendants' actions, SIG has been deprived of its contractual protections.

56. As a direct and proximate result of defendants' actions, SIG will suffer irreparable harm for which there is no adequate remedy at law. The irreparable harm includes, but is not limited to, the loss of its customers, loss of its goodwill and business reputation, and other present and future economic losses not fully calculable at this time.

57. Defendants' interference is committed maliciously, willfully, wantonly, outrageously, or with reckless disregard or indifference to SIG's rights, thereby entitling SIG to an award of punitive damages.

**WHEREFORE**, SIG respectfully requests that this Court enter judgment in its favor and against all defendants, jointly and severally, for:

(a) injunctive relief to prevent the further interference with SIG's contractual rights;

(b) in the alternative, monetary damages; and

(c) any such other relief the Court deems just and proper, including, without limitation, an award of punitive damages.

## COUNT III

## TORTIOUS INTERFERENCES WITH
## EXISTING AND PROSPECTIVE CONTRACTS
**(against all defendants)**

58. SIG incorporates by reference, as if fully set forth herein, the allegations in Paragraphs 1 through 57.

59. Defendants' actions are intended to interfere with SIG's current and prospective customers who were serviced by Carnevale and Moriarty.

60. As a direct and proximate result of defendants' actions, SIG's current and prospective customer relationships will be irreparably harmed.

61. Defendants' interference is committed maliciously, willfully, wantonly, outrageously, or with reckless disregard or indifference to SIG's rights, thereby entitling SIG to an award of punitive damages.

**WHEREFORE**, SIG respectfully requests that this Court enter judgment in its favor and against all defendants, jointly and severally, for:

(a) injunctive relief to prevent the further interference with SIG's contractual rights;

(b) in the alternative, monetary damages; and

(c) any such other relief the Court deems just and proper, including, without limitation, an award of punitive damages.

_____
M. Norman Goldberger
Matthew A. White
Timothy E. Stauss

Attorneys for Plaintiff,
Susquehanna International Group, LLP

Of Counsel:

WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA   19103-2097
(215) 977-2000

Dated:  May 4, 2006